Alan P. Block (SBN 143783)
ablock@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, California 90071
Telephone:   (213) 694-1200
Facsimile:    (213) 694-1234

David Sochia (TX SBN 00797470)
(Pro Hac Vice)
dsochia@McKoolSmith.com
Ashley N. Moore (TX SBN 24074748)
(Pro Hac Vice)
amoore@McKoolSmith.com
Alexandra F. Easley (TX SBN 24099022)
(Pro Hac Vice)
aeasley@McKoolSmith.com
McKool Smith, P.C.
300 Crescent Court, Suite 500
Dallas, Texas 75201
Telephone (214) 978-4000
Facsimile: (214) 978-4044

James E. Quigley (TX SBN 24075810)
(Pro Hac Vice)
jquigley@McKoolSmith.com
McKool Smith, P.C.
300 W. 6th Street, Suite 700
Austin,, Texas 7870
Telephone: (512) 692-8700
Facsimile: (512) 692-8744

Attorneys for Plaintiff
PALO ALTO RESEARCH CENTER INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PALO ALTO RESEARCH CENTER INC., <br><br> Plaintiff. <br><br> v. <br><br> TWITTER, INC., <br><br> Defendant. | Case No. 2:20-cv-10754 AB(MRWx) <br><br> **PALO ALTO RESEARCH CENTER INC.'S RESPONSE TO TWITTER, INC.'S MOTION TO DISMISS** <br><br> DATE: MARCH 19, 2021 <br> TIME: 10:00AM <br> COURTROOM: 7B <br> JUDGE: Hon. André Birotte Jr. |

McKOOL SMITH, P.C.

1

# TABLE OF CONTENTS

2

**Page(s)**

3    I.      INTRODUCTION ............................................................................1

4    II.     LEGAL STANDARD .....................................................................1

5            A.      Motions to Dismiss ...........................................................1

6            B.      Patent Eligibility Under 35 U.S.C. § 101...........................2

7                    1.      *Alice* Step One ........................................................3

8                    2.      *Alice* Step Two ........................................................3

9    III.    ARGUMENT...................................................................................4

10           A.      Twitter's  Motion  Should  be  Denied  for  Failing  to  Meet  and
                     Confer.................................................................................4

11
             B.      The '871 Patent Solves a Notorious Computer Problem with New,
12                   Specific Techniques to Identify Reliable Information...........................7

13                   1.      The '871 Claims are Not Directed to an Abstract Idea. .................8

14                   2.      PARC's Plausible Allegations, When Taken as True, Show
                             the '871 Claims Recite an Inventive Concept. ...........................12
15
             C.      The '781 Patent Solves a Network Problem with Novel Techniques
16                   to Uncover Unseen, Relevant Information Responsive to a User's
                     Needs. ................................................................................15
17
                     1.      The '781 Claims are Not Directed to an Abstract Idea. .................16
18
                     2.      PARC's Plausible Allegations, When Taken as True, Show
19                           the '781 Claims Recite an Inventive Concept. ...........................18

20           D.      The '362 Patent Uses Novel Techniques to Tag and Disseminate
                     Tailored Content Over Networks..........................................................19
21
                     1.      The '362 Claims are Not Directed to an Abstract Idea. .................20
22
                     2.      PARC's Plausible Allegations, When Taken as True, Show
23                           the '362 Claims Recite an Inventive Concept. ...........................23

24           E.      Twitter's Behavior Contradicts Its § 101 Arguments...........................24

25           F.      If Needed, PARC Should Be Permitted to Amend its Complaint ...........24

26   IV.     CONCLUSION ..............................................................................25

27

28

McKOOL SMITH, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

McKOOL SMITH, P.C.

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) ...................................................passim

*Access Ins. Co. v. Peralta*,
   No. 8:15-cv-622-JLS, 2015 WL 13036938 (C.D. Cal. Oct. 13, 2015) ...............6

*Aftechmobile Inc. v. Salesforce.com, Inc.*,
   No. 4:19-cv-5903-JST, 2020 WL 6129139 (N.D. Cal. Sept. 2, 2020)..............25

*Alice Corp. Pty. v. CLS Bank Int'l*,
   573 U.S. 208 (2014)............................................................1, 2, 3, 4

*Ancora Techs., Inc. v. HTC Am., Inc.*,
   908 F.3d 1343 (Fed. Cir. 2018) ...........................................7, 11, 12

*Baker v. Firstcom Music*,
   No. 2:16-CV-08931-VAP, 2017 WL 9500980 (C.D. Cal. Nov. 3, 2017) ..........6

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
   827 F.3d 1341 (Fed. Cir. 2016) ...................................................passim

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................2

*Berg v. Popham*,
   412 F.3d 1122 (9th Cir. 2005) .......................................................2

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) .....................................................2

*BlackBerry Ltd. v. Facebook, Inc.*,
   No. 2:18-cv-1844-GW, 2019 WL 11670622 (C.D. Cal. Oct. 1, 2019).......passim

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
   778 F. App'x 882 (Fed. Cir. 2019) ................................................16

*California Inst. of Tech. v. Hughes Commc'ns Inc.*,
   59 F. Supp. 3d 974 (C.D. Cal. 2014)..............................................21

McKOOL SMITH, P.C.

*CardioNet, LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ...................................................................17

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) .............................................................passim

*Customedia Techs., LLC v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir. 2020) ...................................................................16

*Data Engine Techs. LLC v. Google LLC*,
   906 F.3d 999 (Fed. Cir. 2008) ...................................................9, 10, 21, 22

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014) .............................................................passim

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) .........................................................3, 7, 14

*Erickson v. Pardus*,
   551 U.S. 89 (2007)..........................................................................................2

*Finjan, Inc. v. Blue Coat*,
   879 F.3d 1299 (Fed. Cir. 2018) ............................................................10, 11

*Genetic Techs. Ltd. v. Merial LLC.*,
   818 F.3d 1369 (Fed. Cir. 2016) .....................................................................3

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
   850 F.3d 1332 (Fed. Cir. 2017) ............................................................16, 22

*Intellectual Ventures I LLC v. Symantec Corp.*,
   838 F. 3d 1307 (Fed. Cir. 2016) ..................................................................11

*Kajeet, Inc. v. Qustodio, LLC*,
   No. 8:18-cv-1519-JAK, 2019 WL 8060822 (C.D. Cal. Nov. 1, 2019)..............25

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019) .......................................................8, 9, 12, 22

*McRO, Inc. v. Bandai Namco Games America, Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016) .............................................................3, 17

*Singer v. Live Nation Worldwide, Inc.*,
   No. 8:11-cv-427-DOC, 2012 WL 123146 (C.D. Cal. Jan. 13, 2012) .................6

iii

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020) ..................................................................passim

*Thomas v. Brett Sports & Entm't, Inc.*,
   No. 5:16-cv-480-AB, 2016 WL 4472995 (C.D. Cal. Aug. 23, 2016).................6

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020) .............................................................3, 8

*Ward v. Circus Circus Casinos, Inc.*,
   473 F.3d 994 (9th Cir. 2007) ............................................................4

STATUTES

35 U.S.C. § 101.................................................................................passim

35 U.S.C. § 112.................................................................................23

OTHER AUTHORITIES

FED. R. CIV. P. 15(a)(2)........................................................................24

Local Rule 7-3.................................................................................4, 5, 6

PARC RESPONSE TO TWITTER MOTION TO DISMISS          CASE NO. 2:20-CV-10754 AB(MRWx)

McKOOL SMITH, P.C.

# I.    INTRODUCTION

Twitter levels a second attack on PARC's Patents-in-Suit, alleging that at least five of the six are patent ineligible under 35 U.S.C. § 101.[1] Twitter's main tactic is to reduce the claimed inventions to the point of absurdity, without any reference to the specification, the problems addressed by the technology, or the advances of the claimed inventions over the prior art. In taking Twitter's arguments to their natural conclusion, all software performed on conventional computer components would be ineligible for patent protection. This is also not the law. Software claims that solve computer-related problems or improve computer functionality are patent eligible, regardless of whether they employ existing hardware or not.

In contrast to Twitter's approach, a proper § 101 analysis considers the claims in light of the specification, the problems the claimed inventions overcome, and the environment in which the claimed inventions operate. That is precisely why the *Alice* test starts with what the claims are "directed to," and not what the claims "recite." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). When the Court views the '871, '781, and '362 patents[2] through this lens, each of them is patent eligible. As explained below, they are directed to computer-specific problems, recite concrete techniques for solving those problems, and provide a leap in innovation over existing technologies. If the Court reaches the merits, Twitter's Motion should be denied. However, since Twitter failed to meet and confer in good faith, the Court should deny Twitter's Motion on that basis as well.

# II.    LEGAL STANDARD

## A.    Motions to Dismiss

To defeat a Rule 12(b)(6) motion to dismiss, a complaint must provide enough

---

[1] Rather than brief its arguments in full, Twitter focuses on three patents, joins Facebook's Motion as to two patents, and reserves the right to argue the final patent "at a later stage of the case." Twitter Motion at n.1.

[2] The '871 patent refers to USP 7,167,871, the '781 patent refers to USP 8,606,781, and the '362 patent refers to USP 8,966,362.

McKool Smith, P.C.

factual detail to "give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To make this determination, a court must accept the allegations of the complaint as true, construe the complaint in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Berg v. Popham*, 412 F.3d 1122, 1125 (9th Cir. 2005).

The Federal Circuit has restricted the invalidation of patents on a 12(b)(6) motion to instances when "there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). Patent eligibility may contain disputes over underlying facts, such as "[w]hether the claim elements or the claimed combination are well understood, routine, [or] conventional." *Id.* at 1128. And because patents are presumed valid, "[a]ny fact…that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (internal citations omitted).

## B.    Patent Eligibility Under 35 U.S.C. § 101

Patent-eligible subject matter is described in 35 U.S.C. § 101, which allows for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" to be patented. However, there are certain exceptions, such as "[l]aws of nature, natural phenomena and abstract ideas." *Alice*, 573 U.S. at 216. To determine whether a patent claim contains permissible or impermissible subject matter, the Supreme Court formulated a two-step test, commonly called the "*Alice*" test. Step one considers whether the claims are directed to one of the exceptions. *Id.* at 217. Step two considers whether the claim elements individually or "as an ordered combination…transform the nature of the claim into a patent-eligible application." *Id.* (internal quotations omitted). Since *Alice*, the Federal Circuit has added detail to both steps of the analysis, as described below.

McKool Smith, P.C.

### 1.    *Alice* Step One

*Alice* step one asks "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (internal quotations omitted). The Court must view the claims "in light of the specification." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). The Court should consider "any advances or advantage over the prior art[.]" *Genetic Techs. Ltd. v. Merial LLC.*, 818 F.3d 1369, 1375 (Fed. Cir. 2016). For software inventions, the Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020) (collecting cases). Another factor is "whether the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers." *TecSec*, 978 F.3d at 1293 (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014)).

The Supreme Court has recognized that "[a]t some level, 'all inventions…embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 573 U.S. at 217 (quoting *Mayo*, 132 S. Ct. at 1293 (ellipsis in original)). Thus, "courts must be careful" in step one of the analysis "to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games America, Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). This is because "describing the claims at [a] high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to §101 swallow the rule." *Enfish*, 822 F.3d at 1337. That is to be avoided at all costs. *Alice*, 573 U.S. at 217.

### 2.    *Alice* Step Two

If the character of the claims as a whole—read without oversimplification and in light of the specification—are directed to excluded matter, then the Court proceeds to *Alice* step two. Step two asks whether the claim elements, considered both

3

1    individually and as an ordered combination, contain an "inventive concept." *Id.* Courts

2    must again be careful, as "[t]he inventive concept inquiry requires more than

3    recognizing that each claim element, by itself, was known in the art." *BASCOM*

4    *Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

5    "[A]n inventive concept can be found in the non-conventional and non-generic

6    arrangement of known conventional pieces." *Id.* And "implementing a well-known

7    technique with particular devices in a specific combination...can be inventive."

8    *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318 (Fed. Cir. 2019).

9    **III.    ARGUMENT**

10       **A.    Twitter's Motion Should be Denied for Failing to Meet and Confer.**

11          Twitter's Motion should be denied without reaching the merits because, prior to

12   filing, Twitter refused to describe the bases for its § 101 allegations and never

13   engaged in a good faith discussion of the substance of its contemplated motion.

14          Local Rule 7-3 sets forth a party's meet and confer obligations, stating that

15   "counsel contemplating the filing of any motion shall first contact opposing counsel to

16   *discuss thoroughly*, preferably in person, *the substance of the contemplated motion*

17   and any potential resolution." L.R. 7-3 (emphases added). The Court's Standing Order

18   provides that the Rule will be "strictly enforced" and reiterates the language requiring

19   *a movant* to "'discuss thoroughly...the substance of the contemplated motion[.]'" Dkt.

20   15 at 4 (omission in original). The Standing Order explains that "[t]he purpose of

21   meeting and conferring is to attempt to obviate the need for a motion and thus avoid

22   unnecessary Court intervention, or to narrow the scope of issues the Court must

23   resolve; the parties *must* meet and confer in a good faith attempt to fulfill this

24   purpose." *Id.* (emphasis in original). The remedy for failing to meet and confer in

25   good faith is "strik[ing] or outright deny[ing] a motion or other relief." *Id.*; *see, e.g.*,

26   *Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 1000 (9th Cir. 2007).

27          The pre-filing meet and confer requirement is clear and unequivocal. Despite

28   acknowledging its obligation under Local Rule 7-3, Twitter never disclosed the

McKool Smith, P.C.

4

substance of its contemplated motion prior to filing. In its first notice on the subject, Twitter sent PARC a letter (largely copying Facebook's) that included just 1.5 pages of text on "Section 101 Unpatentability." *Id.* Rather than articulate any basis for its § 101 allegations, Twitter simply summarized the two-step *Alice* test and provided a laundry list of cases finding patents ineligible. Not once did Twitter analyze any of the Patents-in-Suit, or actually apply the *Alice* test to explain why it believed a particular claim was not patent eligible. Other than an incidental mention of the '362, Twitter did not name a single patent in its letter.

The parties participated in a meet and confer via conference call approximately one week later. During the meet and confer, Twitter refused to provide any additional information about the substance of its § 101 allegations and instead pressed PARC to describe how each of the Patents-in-Suit satisfies the *Alice* inquiry. *See* Dkt. 43-4. PARC explained the difficulty of providing such a response given the lack of detail or analysis in Twitter's letter; however, in an effort to meet and confer in good faith, PARC spent nearly 30 minutes describing on a patent-by-patent basis how they are directed at patent-eligible subject matter. *See id.* ("As PARC explained during the call, it is difficult, if not impossible, to divine Defendants' arguments and preemptively address them with any specificity. Nor should such an ambush be the appropriate manner in which a meet and confer is conducted."). At no point during the meet and confer did Twitter "discuss…the substance of its contemplated motion[,]" as confirmed by both parties' summaries of the call. L.R. 7-3; Dkt. 43-5 (email reflecting that no information or explanation was disclosed by Twitter); Dkt. 43-4 (PARC letter reflecting same). Two days after the parties' meet and confer, PARC sent Twitter a five-page letter outlining its positions as to why each of the Patents-in-Suit are directed at patent-eligible subject matter. *See* Dkt. 43-4. In that letter, PARC pointed out that Twitter had not yet described the bases for its § 101 allegations and had failed to comply with its obligation to meet and confer in good faith. *See id.*

On February 5, two weeks *after* the parties' meet and confer, Twitter sent

McKool Smith, P.C.

PARC a four-sentence email identifying the three patents that were the subject of Twitter's forthcoming Motion. Dkt. 43-5. Twitter closed its email by asking for PARC's availability to meet and confer on these patents. *Id.* PARC then asked if Twitter was "going to explain its views of patent eligibility for the 871, 781, and 362." *Id.* PARC explained that PARC "cannot hear [Twitter's] positions for the first time on a call…and be expected to respond on the fly." *Id.* Twitter responded with a generic suggestion that the claims of the Patents-in-Suit do not recite internet-specific solutions to internet-specific problems and/or do not recite inventive concepts. In its email, Twitter failed to provide any reasoning to support its conclusory allegations. On February 15, PARC responded to Twitter's latest arguments, once again detailing why the Patents-in-Suit pass muster under § 101. *Id.* PARC's email also stated that Twitter "ha[d] failed to meet and confer in good faith" and "the basis for [Twitter's] assertions remain[] woefully insufficient." *Id.* Twitter then filed its Motion.

Despite PARC's repeated requests, Twitter refused to provide any information about the bases for its § 101 allegations and never once "discuss[ed] the substance of the contemplated motion[,]" much less provided a "thorough" discussion of the motion's contents. Twitter's pre-filing behavior constitutes a violation of Local Rule 7-3 and thus the Court should strike or deny Twitter's Motion. *See* Dkt. 15 at 4; *Baker v. Firstcom Music*, No. 2:16-CV-08931-VAP, 2017 WL 9500980, at *4 (C.D. Cal. Nov. 3, 2017) (denying motion because counsel failed to discuss "'the substance or content'" of the motion prior to filing); *Singer v. Live Nation Worldwide, Inc.*, No. 8:11-cv-427-DOC, 2012 WL 123146, at *2 (C.D. Cal. Jan. 13, 2012) (denying motion for failure to comply with Local Rule 7-3); *Thomas v. Brett Sports & Entm't, Inc.*, No. 5:16-cv-480-AB, 2016 WL 4472995, at *1 (C.D. Cal. Aug. 23, 2016) (denying motion for failure to comply with Rule 7-3); *Access Ins. Co. v. Peralta*, No. 8:15-cv-622-JLS, 2015 WL 13036938, at *1 (C.D. Cal. Oct. 13, 2015).

PARC RESPONSE TO TWITTER MOTION TO DISMISS                    CASE NO. 2:20-CV-10754 AB(MRWx)

McKool Smith, P.C.

1

2

**B.     The '871 Patent Solves a Notorious Computer Problem with New, Specific Techniques to Identify Reliable Information.**

3

4

5

6

7

8

9

10

11

12

13

Turning to the merits of Twitter's arguments, PARC must first recalibrate the inquiry based on controlling case law completely ignored by Twitter. The Federal Circuit has been clear. Claims solving computer-related problems with computer-related solutions pass muster under § 101. *See, e.g., Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018) (holding that "specific technique[s] that depart[] from earlier approaches to solve a specific computer problem" are patent eligible); *Enfish*, 822 F.3d at 1339 (holding that the claims solve "a problem in the software arts…[and] are not directed to an abstract idea"); *TecSec*, 978 F.3d at 1293; *DDR*, 773 F.3d at 1257-59 (finding "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks" and is therefore patent eligible).

14

15

16

17

18

19

20

21

22

23

24

25

To apply this framework to the '871 patent, a basic summary of the patented technology is in order. At the time of the '871 invention, a "notoriously difficult problem" on computer networks was that users could "not eas[il]y [] recognize which documents…provide[d] reliable authoritative information." '871 patent at 1:13-18. The Internet posed particular issues because the authoritativeness of web documents was "commonly measured based on social networks," popularity, and "link structure," rather than the content of the document itself. *Id.* at 1:22-32, 1:36-43; *see also id.* at 4:54-57. However, a document's content is typically highly useful in determining authoritativeness. *Id.* at 1:39-43. Because of this misguided assumption that social reach equals authoritativeness, search results often displayed unauthoritative webpages well before more reputable, authoritative sources. *Id.* at 2:9-29. And users may not be able to distinguish between the two. *Id.*

26

27

28

The '871 patent solves this problem by "enabl[ing] document collection search processes, such as web-based document search processes, to be improved using textual authority estimating models." *Id.* at 4:62-65. The claims are directed to this

McKool Smith, P.C.

7

solution because they recite a specific technique to determine the authoritativeness of documents by their textual contents instead of their popularity or link structure. This begins in the very first step, which determines a set of document content feature values *based on textual contents in the document*. *See id.* at claim 1 (emphasis added). The authoritativeness decision is made by the claimed "trained document textual authority model." *Id.* At a high level, this model "is based on a set of documents that were manually labeled as to degree of textual authority, a set of document content features that were determined to be good predictors of the authoritativeness of a document, and a predictive model trained on the labeled document data." *Id.* at 6:28-34. In one embodiment, the trained document textual authority model considers document attributes, such as peer review, author background, target audience, and author affiliations among others (*id.* at 9:16-32); document classification (*id.* at 9:38-46); and document features (*id.* at 9:47-52). A subset of document features may be selected using regression techniques and may include "linguistic content…, hyperlinks,…and tables." *Id.* at 9:52-59, 10:4-11. Finally, "a linear regression algorithm model or a boosted decision tree algorithm model…classif[ies] the documents." *Id.* at 10:26-40. The trained document textual authority model then renders an authoritativeness decision based on this information, and that decision is output in association with the document. *See id.* at 10:35-58; claim 1. The '871 patent therefore departs from convention, and advances the state of Internet technology to indicate when information is authoritative instead of simply popular.

### 1.   The '871 Claims are Not Directed to an Abstract Idea.

Step one of the *Alice* inquiry is to "determine whether the claims are directed to a 'patent-ineligible concept,' such as an abstract idea." *Uniloc,* 957 F.3d at 1306. The Court should "look at the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter." *Koninklijke KPN N.V. v. Gemalto M2M GmbH,* 942 F.3d 1143, 1149 (Fed. Cir. 2019). The Court

must also consider the claims "as a whole, and in light of the specification." *Data Engine Techs. LLC v. Google LLC,* 906 F.3d 999, 1007 (Fed. Cir. 2008) ("*DET*"); *see also TecSec*, 978 F.3d at 1295 (holding that the "specification…shows that the claims at issue are directed at solving a problem specific to computer data networks"). For software innovations, this decision turns on whether the claims are directed to (1) improvements to the functionality of a computer or network platform itself or (2) a solution to a problem specifically arising in the realm of computers or networks. If so, they are patent eligible. *TecSec*, 978 F.3d at 1293; *Koninklijke*, at 1149-50.

The '871 claims meet this criteria, and the *DET* case is instructive to this analysis. There, the Federal Circuit held that claims directed to navigating electronic spreadsheets were not abstract. *DET*, 906 F.3d at 1007-08. In doing so, the *DET* court looked to the specification, which "teaches that prior art computer spreadsheets were not user friendly." *Id.* at 1008. They were "burdensome…, undercutting the effectiveness of the computer as a means to review and edit a spreadsheet." *Id.* The *DET* '259 patent "solved this known technological problem in computers in a particular way—by providing a highly intuitive, user-friendly interface with familiar notebook tabs[.]" *Id.* It claimed "this technical solution [by]…recit[ing] specific steps detailing the method of navigating through spreadsheet pages…using notebook tabs." *Id.* The Federal Circuit ruled the claims patent eligible because, when viewing the claims in light of the specification, they solved a computer-specific problem and improved "computer spreadsheet functionality." *Id.*

Under this reasoning, the '871 claims also pass *Alice* step one. The '871 specification describes that the Internet poses a "notoriously difficult problem" in that the authoritativeness of web documents is based on how widely they are referenced, not their content. '871 patent at 1:13-18. As a result, the Internet is not effective at searching, returning, or identifying authoritative documents. *Id.* at 2:9-29. The '871 patent therefore identifies a network-specific problem. Like *DET*, the '871 claims solve this network problem in a particular way by reciting specific steps detailing the

McKool Smith, P.C.

method of determining a document's authoritativeness. First, the '871 claims require that document content feature values be determined "based on textual contents in the document." *Id.* at claim 1. Second, those feature values are fed to a "trained document textual authority model" that uses a variety of techniques (*e.g.,* statistical processing, metric-regression algorithms, or AdaBoost algorithms) to determine a document's authoritativeness. *Id.* at claims 9-11. The '871 claims therefore recite a "specific improvement over prior art systems….[and a]re directed to 'an improvement in the functioning of computers[,]'" making them patent eligible. *DET*, 906 F.3d at 1009 (citing *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018)).

Much like Twitter, the *DET* defendant argued that "humans have long used tabs to organize information." *Id.* at 1011. Though the Federal Circuit "agree[d] that tabs existed outside the context of electronic spreadsheets[,]…it is not enough [] to merely trace the invention to some real-world analogy. The eligibility question is not whether anyone has ever used tabs to organize information." *Id.* The Court then dismissed this argument, holding that the defendant "failed to appreciate the functional improvement achieved by…the claimed methods." *Id.*

The same holds true here. While Twitter recognizes that large collections of documents have been around for centuries, the eligibility question is not whether anyone has ever searched through paper documents before. Twitter ignores that the Internet exacerbates the authoritativeness problem exponentially because it uses social networks and link structure (instead of content) to measure authoritativeness. '871 patent at 1:22-32, 1:36-43. The '871 patent provides a functional improvement to that prior art by considering the document's content, whose feature values are provided to a trained model to determine authoritativeness as recited in the claims. Twitter's failure to appreciate this distinction does not render the claims ineligible.

Next, Twitter alleges that the claims are results oriented and thus abstract. Mot. at 7-8. However, the '871 claims "recite more than a mere result." *Finjan, Inc. v. Blue*

McKool Smith, P.C.

*Coat,* 879 F.3d 1299, 1305 (Fed. Cir. 2018). They "recite specific steps…that accomplish the desired result." *Id.* at 1305-06. The steps claimed in the '871 patent include determining document content feature values based on the textual contents of the document, and using a trained document textual authority model to determine authoritativeness based on the feature values as described in detail above. The '871 claims recite specific steps for making an authoritativeness determination, and are therefore not abstract. *Finjan*, 879 F.3d at 1305-06; *Ancora* at 1569 (finding claims directed to a way of achieving a result "passes muster under *Alice* step one.").

Twitter relies heavily on the *Symantec* case to support its argument. However, *Symantec* is easily distinguishable. There the claims related to email filtering to reduce spam. *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F. 3d 1307, 1313 (Fed. Cir. 2016). The claims were found abstract because the problem (junk mail) and its solution (throwing away junk mail) were the same regardless of whether they were performed on a computer or by a human. *Id.* at 1314. In comparing *Symantec* to the '871 patent, Twitter glosses over the fact that the problem of the '871 patent, and its solution, are both specific to computer networks. *See* '871 patent at 1:22-32; 1:36-43; 4:54-57. The claimed textual authority model provides a computer-specific way of assessing authoritativeness. Thus, the problem and solution are not the same whether performed by a computer or by a human.

Even more, the social-reach versus content authoritativeness problem has no pre-computer analogue. *See BlackBerry Ltd. v. Facebook, Inc.*, No. 2:18-cv-1844-GW, 2019 WL 11670622, at *25 (C.D. Cal. Oct. 1, 2019) (finding that photo tagging has no "true pre-computer analogue" even though "a person could take a stack of sticky notes [and]…slap[] a desired [sticky note] tag on a hard-copy photo."). Thus, "the same convenience and benefit" of performing the claimed invention "in a computer context…are lost." *Id.* at *73-74. The Federal Circuit has even endorsed this distinction over *Symantec* when finding software claims patent eligible. *See TecSec*, 978 F.3d at 1293 (citing cases supporting patent eligibility when "the focus of the

PARC RESPONSE TO TWITTER MOTION TO DISMISS                    CASE NO. 2:20-CV-10754 AB(MRWx)

claimed advance is on a solution 'to a problem specifically arising in the realm of computer networks.'"); *Koninklijke*, 942 F.3d at 1150; *Ancora*, 908 F.3d at 1349-50. The '871 claims are not directed to an abstract idea and pass *Alice* step one. And to the extent Twitter argues that the claims do not recite these network-specific features, PARC submits that the Court should construe the terms "document," "document content feature values," and/or "trained document textual authority model" before ruling otherwise as a matter of law.

2.   **PARC's Plausible Allegations, When Taken as True, Show the '871 Claims Recite an Inventive Concept.**

As demonstrated above, the '871 claims pass *Alice* step one; thus, the Court need not consider step two. Nevertheless, to the extent the Court deems the analysis necessary, the '871 claims recite an inventive concept. Twitter's main argument is that, because the specification states that "any device" may be used to implement the claimed inventions, the claims cannot contain an inventive concept. Mot. at 10. This is incorrect. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art….[A]n inventive concept can be found in the non-conventional and non-generic arrangement of *known, conventional pieces*." *BASCOM*, 827 F.3d at 1350 (emphasis added). Similarly, "implementing a *well-known technique* with particular devices in a specific combination…can be inventive." *Cellspin*, 927 F.3d at 1318 (emphasis added). All that is needed to survive Twitter's Motion on this point is "plausible and specific factual allegations that aspects of the claims are inventive." *Id.* at 1317; *see also Aatrix*, 882 F.3d at 1128 (holding allegations that the claims "are not well-understood, routine, or conventional" sufficient for inventive concept); *BlackBerry Ltd. v. Facebook, Inc.*, No. 2:18-cv-1844-GW, 2018 WL4846912, at *7 (C.D. Cal. Aug. 2, 2018) (holding "factual issues preclude dismissal" because there is "a factual dispute regarding whether [a claim term]…is a well-understood, routine, and/or conventional computer component."). Given Twitter's misunderstanding of court precedent, its argument should fail on this

McKool Smith, P.C.

1  basis alone.

2      In addition, Twitter asks this Court to make a factual determination that none of

3  the '871 claim elements involve inventive concepts. This is improper in a motion to

4  dismiss. *See Aatrix*, 882 F.3d at 1128 (holding that "[w]hether the claim elements or

5  the claimed combination are well-understood, routine, [or] conventional is a question

6  of fact. And in this case, that question cannot be answered adversely to the patentee

7  based on the sources properly considered on a motion to dismiss…."). Regardless,

8  nothing in the record suggests that the claimed subject matter is not an inventive

9  concept. It suggests just the opposite. The Complaint defines the notoriously difficult

10 problem of the prior art. Dkt. 1 ¶ 169 ("[I]t is not easy to recognize which documents,

11 for example, which web pages and web documents, provide reliable authoritative

12 information about a subject."). The Complaint also states that "[l]arge amount[s] of

13 misinformation, especially for high-value information like medical issues and

14 informational news, have exacerbated the issue such that PARC set about to solve it."

15 *Id.* ¶ 170 (citing '871 patent at 2:12-15). The Complaint explains that the '871's

16 inventive concept over existing techniques was "analyzing the text of the document

17 itself for cues of its reliability" rather than "determining reliability based on the

18 popularity or wide-spread circulation of Internet-based information." *Id.*

19     This concept is also peppered throughout the '871 specification and prosecution

20 history.[3] *See, e.g.,* '871 patent at 2:39-41 ("This invention provides systems and

21 methods for determining authoritativeness of a document based on textual, non-topical

22 cues"), 4:62-65 ("The systems and methods of this invention enable document

23 collection search processes, such as web-based document search processes, to be

24 improved using textual authority estimating models"). For example, the patentee

25 stated that the prior art "determin[ed] authoritativeness of a web page based on the

26

27  ──────────────────

28  [3] As explained in a contemporaneously filed request, PARC asks this Court to take
    judicial notice of the prosecution histories.

McKool Smith, P.C.

McKool Smith, P.C.

1   degree the web page is referred to via links by other web pages." Ex. A at 7.[4] "Such a

2   link is not textual content in a document for which the authoritativeness is to be

3   determined. [The prior art] does not disclose or suggest determining authoritativeness

4   of a document based on textual contents in a document." *Id.* at 8; *see also* Ex. B at 9.

5   The Examiner conceded this point, finding that "determining an authoritativeness for

6   the document based on the determined set of document content feature values using a

7   trained document textual authority model" distinguishes the claims over the prior art.

8   Ex. C at 3. Using a document's textual contents to assess authoritativeness, and the

9   trained textual authority model for making that decision, are inventive concepts that

10   survive step two of the *Alice* inquiry.

11       As common sense and the cases illustrate, just because software can be

12   implemented on existing hardware does not mean the software is not new or inventive.

13   *See Enfish*, 822 F.3d at 1335 (finding that "[s]oftware can make non-abstract

14   improvements to computer technology…."). The Federal Circuit has gone even

15   further, confirming that *existing* hardware and *existing* software can contain an

16   inventive concept. For example, the *Cellspin* claims recited known HTTP software

17   and known mobile phone hardware, but still contained an inventive concept by "using

18   HTTP at a specific location." *Cellspin*, 927 F.3d at 1318. The Federal Circuit

19   ultimately held that "Cellspin made specific, plausible factual allegations about why

20   aspects of its claimed inventions were not conventional…, [and] the district court

21   erred by not accepting those allegations as true." *Id.* at 1317-18; *see also Aatrix*, 882

22   F.3d at 1126-27 (holding that "patentees who adequately allege their claims contain

23   inventive concepts survive a § 101 eligibility analysis.").

24       *Cellspin* does not stand alone in this regard. In *BASCOM*, the Federal Circuit

25   noted that the claims "recite generic computer network and Internet components, none

26   of which is inventive by itself." *BASCOM*, 827 F.3d at 1349. Yet the *BASCOM* court

27

28   _____
    [4] All exhibits are attached to the Declaration of Alexandra F. Easley.

PARC RESPONSE TO TWITTER MOTION TO DISMISS                CASE NO. 2:20-CV-10754 AB(MRWx)

1  found that "install[ing] a filtering tool at a specific location remote from end users"

2  was an inventive concept despite the tool itself and the hardware components being

3  well known. *BASCOM*, at 1350. The *Amdocs* case provides another example. There

4  the court ruled that even though "[t]he solution requires arguably generic components,

5  …these generic components operate in an unconventional manner to achieve an

6  improvement in computer functionality." *Amdocs*, 841 F.3d at 1300-01. As such,

7  Twitter's complaint that the '871 invention can be implemented on a conventional

8  computer is irrelevant. The record before the Court, detailed above, confirms that the

9  claims contain an inventive concept, and are patent eligible under *Alice* step two.

## C. The '781 Patent Solves a Network Problem with Novel Techniques to Uncover Unseen, Relevant Information Responsive to a User's Needs.

12  Twitter describes the '781 invention as "nothing more than the fundamental

13  practice of providing suggestions for new items to someone based on what that person

14  has seen before." Mot. at 13. It then argues this process is done regularly by librarians.

15  *Id.* This is a gross oversimplification. The '781 patent first sets the stage by describing

16  the problems associated with conventional web search engines, *i.e.,* that they

17  frequently "retrieve previously accessed information." '781 patent at 1:27-29. Said

18  conversely, "they are not focused on discovering new-unseen information relevant to

19  the user's current information retrieval goals." *Id.* at 1:29-32.

20  The '781 patent then describes the solution, which is far more complex than a

21  librarian's suggestions. When responding to a user query, the '781 inventions first

22  retrieve a user history. *Id.* at claim 1. The user history "provides a record of the

23  documents previously viewed by the user," such as URLs previously accessed by the

24  user's web browser. *Id.* at 5:29-31, 3:61-65. The history is used to determine a

25  "proximal neighborhood" of information previously unseen by the user. *Id.* at claim 1.

26  The proximal neighborhood "reflects linked but unseen documents" (*e.g.,* unseen web

27  pages) within a threshold link distance of web pages already accessed by the user. *Id.*

28

McKool Smith, P.C.

PARC RESPONSE TO TWITTER MOTION TO DISMISS                 CASE NO. 2:20-CV-10754 AB(MRWx)

at 4:25-29. For instance, if the distance is two links, the unseen web page must be within two links of previously-accessed web pages. *Id.* at 5:5-8. In this way, the unseen information "is likely to be topically related since it lies within a threshold link distance of information previously accessed by the user." *Id.* at 13:56-58. The user's search query is then applied to the unseen information to determine which unseen information matches the query. *Id.* at claim 1. As such, the '781 patent improves existing search capabilities by locating relevant, unseen information responsive to a user's query.

### 1.   The '781 Claims are Not Directed to an Abstract Idea.

Twitter suggests the '781 claims relate to the basic concept of "tailoring" or "gathering and analyzing information." Mot. at 13-14. In making this argument, Twitter turns a blind eye to the claims' requirement that the search be applied to previously unseen linked information within a threshold distance of linked information in the user's history. This is much more than simply tailoring advertisements based on location/time or dedicating a section of computer memory to advertising data as in *IV/Capital One*, *Customedia*, and *Bridge & Post. See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1370 (Fed. Cir. 2017) ("*IV/Capital One*") (describing the claims as "[t]ailoring information based on the time of day"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1363 (Fed. Cir. 2020) (describing the claims as "dedicating a section of the computer's memory to advertising data"); *Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 884 (Fed. Cir. 2019) (describing the claims as "[t]ailoring advertisements based on real time information about the user and their location").

The '781 claims instead create a new way to access previously-unseen information that is relevant to a user's query. This happens through the creation of a proximal neighborhood of unseen documents within a certain threshold distance, and applying the user's query to that proximal neighborhood. In this way, the "new

McKool Smith, P.C.

PARC RESPONSE TO TWITTER MOTION TO DISMISS                CASE NO. 2:20-CV-10754 AB(MRWx)

1    information is likely to be topically related since it lies within a threshold link distance
2    of information previously accessed by the user." '781 patent at 13:56-58. Contrary to
3    Twitter's unsupported allegation, this is a specific way of resolving a computer
4    problem that adds several layers of complexity beyond the basic concepts of tailoring
5    or analyzing information.

6         Moreover, the '781 claims are patent eligible because they are "necessarily
7    rooted in computer technology in order to overcome a problem specifically arising in
8    the realm of computer networks." *DDR*, 773 F.3d at 1257. The claims are rooted in
9    computer technology, as they require searching linked documents and determining
10   unseen documents within a threshold distance from previously-accessed documents.
11   *See* '781 patent at claim 1. The '781 claims also overcome the computer-network
12   problem of search engines frequently returning already-viewed or irrelevant webpages
13   rather than relevant, previously-unseen ones. *Id.* at 1:18-32; 13:56-58. This is similar
14   to *DDR*'s computer-network problem of losing web site visitors when they leave the
15   site by clicking an advertisement. *DDR*, 773 F.3d at 1257. Just as the *DDR* court
16   found those claims to be patent eligible for resolving a computer problem, this Court
17   should find the '781 claims patent eligible. *Id.* at 1259.

18        Twitter next seems to suggest that the '781 claims only "add[] conventional
19   computer components to well-known business practices." Mot. at 15. This is incorrect.
20   Searching linked documents on a network to find unseen ones that are within a certain
21   threshold link distance is not a "well-known business practice," nor does Twitter
22   suggest otherwise. Instead, it skips that part of the claim when concluding "[c]laim 1
23   covers the basic practice of providing new and relevant information to a user based on
24   the user's history." Mot. at 15. In short, Twitter has run into the trap of
25   oversimplifying the claims, which the Federal Circuit has repeatedly cautioned
26   against. *McRO*, 837 F.3d at 1313; *TecSec*, 978 F.3d at 1293; *CardioNet, LLC v.*
27   *InfoBionic, Inc.*, 955 F.3d 1358, 1371 (Fed. Cir. 2020). Given Twitter's failure to even
28   address the full import of the claims, and the fact that the '781 claims are directed to a

solution specific to the computer realm, they pass step one of the *Alice* inquiry. And if Twitter argues that the claims do not recite the features noted above, PARC submits that the Court should construe the terms "user history," "access patterns," "linked information elements," and/or "threshold distance" before ruling otherwise as a matter of law.

### 2. PARC's Plausible Allegations, When Taken as True, Show the '781 Claims Recite an Inventive Concept.

As the '781 claims pass *Alice* step one, it is unnecessary to consider step two. Even so, it is notable that Twitter again forgoes any analysis of the relevant claim elements, instead assuming that they are "routine data-gathering step[s]." Mot. at 16. Twitter never squarely addresses whether the '781 patent's identified inventive concept—"discovering new-unseen information relevant to the user's current information retrieval goals"—is actually an inventive concept. '781 patent at 1:29-32. This idea is captured in the Complaint and the claims, which (1) "determin[e] a proximal neighborhood…comprising only linked information elements previously unseen by the user that are within a threshold distance of the linked information elements" and (2) "determin[e] search results comprising the unseen linked information elements that match the query." *Id.* at claim 1; Dkt. 1 ¶¶ 112-16. The prosecution history confirms this notion as well. It repeatedly emphasizes that one advance over the prior art is collecting and searching previously unseen documents within a threshold distance of previously accessed documents. *See, e.g.,* Ex. D at 12; Ex. E at 9 (stating that the prior art "search query is carried out on the entire corpus of unrelated documents…, rather than searching the unseen linked information elements in the proximal neighborhood using the query, per Claims 1 and 19"); Ex. F at 9; Ex. G at 9.

To survive Twitter's Motion, PARC need only show "plausible and specific factual allegations that aspects of the claims are inventive." *Cellspin*, 927 F.3d at 1317; *see also Aatrix*, 882 F.3d at 1128 (holding allegations in the complaint that the

McKool Smith, P.C.

McKool Smith, P.C.

1   claims "are not well-understood, routine, or conventional" to be sufficient for

2   inventive concept); *BlackBerry*, 2018 WL4846912, at *7 (holding "factual issues

3   preclude dismissal" because there is "a factual dispute regarding whether [a claim

4   term]…is a well-understood, routine, and/or conventional computer component."). As

5   noted above, PARC has done that. The claims, specification, prosecution history, and

6   Complaint provide ample allegations that—when taken as true—show the '781 claims

7   contain an inventive concept.

8        Twitter's only other argument is that the "jargon" used in the claims does not

9   confer an inventive concept. Mot. at 17. Apart from picking out some terms in

10  isolation, Twitter does not analyze whether the element itself contains an inventive

11  concept; rather, Twitter simply presumes this to be the case. For all the reasons noted

12  above, the '781 claims include an inventive concept and are therefore patent eligible.

13       **D.   The '362 Patent Uses Novel Techniques to Tag and Disseminate
              Tailored Content Over Networks.**

15       Twitter describes the '362 invention as "jotting notes about follow-up actions

16  within a document." Mot. at 20. It then argues the '362 patent's process could readily

17  be done by hand and is thus patent ineligible. *Id.* Twitter's inapt analogy dramatically

18  oversimplifies the invention. To recognize Twitter's sleight of hand, one must first

19  consult the specification. PARC did not describe a "jotting notes" process. Rather,

20  PARC noted the various problems with conventional—yet electronic—document

21  editing systems. They include "only send[ing] information at the level of entire

22  documents," or "manually extract[ing] the specific content to be shared," which

23  "makes it difficult to reestablish context for the information or to incorporate

24  responses into the original content." '362 patent at 1:18-29. The process is still a

25  computer-specific process. It "typically require[s] special sharing-related interfaces or

26  applications," and "specialized functions, such as requests for comments, edits, or

27  approval, [] often performed in an ad-hoc fashion using, for example, context

28  provided in an email message." *Id.* at 1:29-40. The problem originated in the

cumbersome way in which users collaborated and shared electronic information.

The '362 patent then describes the solution, including how the solution is achieved, which is far more complex than jotting down notes on a document. A user of the '362 document editing system first inputs a natural language tag. *Id.* at claim 1. The tag is inserted inline and contains a receiving user, a command, and the portion of the document on which the command will be executed. *Id.* The invention then processes the tags and disseminates the portion indicated to the receiving entity to facilitate the action specified. *Id.* To help the recipient perform the tagged action, the invention can provide the user with context for the tagged portion of the document. *Id.* at 3:15-21. This "reduce[s] the information the recipient needs to consider," and "increase[s] the likelihood that the recipient will be able to respond in a timely fashion, and the likelihood that the response will be more focused on the issues of concern." *Id.* at 3:27-31. In addition, the patent's specification teaches how the user determines what the recipient does with the content. For example, the user may "show" or "share" content. *Id.* at 4:19-24. When a user "shares" content the receiving entity may "view and change the content and the modified content can be incorporated into the original content." *Id.* When a user "shows" content, the recipient may view the content but any changes will not be incorporated. *Id.* By allowing the user to specify the amount of context associated with a tag, and restricting the recipient's available responses to the tagged information, the '362 patent allows communities to share content in more constructive, targeted, and efficient ways.

### 1. The '362 Claims are Not Directed to an Abstract Idea.

Twitter first argues that the '362 is nothing more than "how documents are commonly marked up with pen and paper." This analogy is an unsuitable one. It ignores that the claimed "dissemination" of the tagged document controls the amount of information shared and the actions the recipient can take. '362 patent at 4:13-19. In sum, the sender may limit the receiving entity's ability to view certain portions of the

McKool Smith, P.C.

1  document, and may also preclude the receiver from making any changes to the

2  document. All of these features are lost in Twitter's paper document analogy. For

3  example, there is no opportunity to lock out the recipient's ability to make changes in

4  a paper document. As another example, the receiving entity may deviate from the

5  requested action (*e.g.,* providing comments and corrections when the document asked

6  for final approval). Nor do paper documents suffer from version control issues ripe in

7  most electronic document collaborations. Twitter's analogy is therefore improper. *See*

8  *DET*, 906 F.3d at 1011 (holding that it is "not enough [] to merely trace the invention

9  to some real-world analogy"); *see also California Inst. of Tech. v. Hughes Commc'ns*

10  *Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) ("The problems of pencil-and-paper

11  analysis are heightened in the context of software…[and] can mislead courts into

12  ignoring a key fact: although a computer performs the same math as a human, a

13  human cannot always achieve the same results as a computer."); *BlackBerry*, 2019

14  WL 11670622, at *25 (finding that photo tagging has no "true pre-computer

15  analogue" even though "a person could take a stack of sticky notes [and]…slap[] a

16  desired [sticky note] tag on a hard-copy photo.").

17       When the Court considers the claim language (rather than Twitter's paper

18  document analogy), the controlling authority shows the '362 claims are not an abstract

19  idea. First, the '362 claims are patent eligible because they are "necessarily rooted in

20  computer technology in order to overcome a problem specifically arising in the realm

21  of computer networks." *DDR*, 773 F.3d at 1257.[5] In Twitter's paper document

---

[5] Twitter states that Claim 1 [of the '362 patent] does not require the use of any technological components, let alone an improvement to any technological components." Mot. at 20. Twitter fails to note that the definitions in the specification cannot be read as anything other than involving technological components. For example, a "document" can be "a text file, an audio file, an email, a piece of programming code, a video clip, or a multi-media file," '362 patent at 4:2-4, and a "'tag' refers to a piece of descriptive text which can be inserted into a document, often inline with a document." Both of these terms appear in claim 1. *See id.* at claim 1. From a plain reading of the definitions as used in the specification, there is no logical read of claim 1 that does not involve the use of computer components.

scenario, a party marking up a paper document might choose to share only a small part of the document for review, knowing that it will be easy to re-integrate back into the original document. On the other hand, the '362 explains the entire document must be sent or the user must "manually extract the specific content to be shared[,]" which "makes it difficult to reestablish context for the information or to incorporate responses into the original content." '362 patent at 1:18-29. This loss of context is a computer-specific problem.

The '362 patent solves this problem using a computer-specific solution: tags that control the amount of information shared with the recipient, and the actions he/she can take. *Id.* at 4:13-23. Since the claims involve a specific solution to a known computer problem, they are not abstract. *DDR*, 773 F.3d at 1257; *see also DET*, 906 F.3d at 1008 (holding tabs in an electronic spreadsheet patent eligible for solving a "known technological problem in computers in a particular way—by providing a highly intuitive, user-friendly interface with familiar notebook tabs….").

Twitter relies on *IV/Capital One* to suggest that tagging-related inventions are patent ineligible. Mot. at 22-23. However, the Federal Circuit did not reach that holding. Moreover, the *IV/Capital One* claims did not include the word "tag," nor was it the basis for which the Federal Circuit ruled. *IV/Capital One*, 850 F.3d at 1338-39. At bottom, the Federal Circuit held that the claims allowed a user to "update XML documents," but noted that limiting the claims to XML documents did "not render an otherwise abstract concept any less abstract." *Id.* at 1339.

And in distinguishing *IV/Capital One*, the Federal Circuit has found that claims specifically reciting an implementation that improves a prior art system are patent eligible. *Koninklijke*, 942 F.3d at 1153. So too is the case for the '362 claims. Providing the claimed inline tag, which identifies the portion of the document to be disseminated along with actions to be taken, is a specific solution that improves the prior art's requirement to provide the whole document or manually clip out relevant portions while losing invaluable context. For the same reasons noted in *Koninklijke*,

McKool Smith, P.C.

1    *IV/Capital One* is different from the facts here.

2          Throughout its Motion, and for the '362 patent, Twitter argues that the claims

3    are ineligible for failing to describe how the inventions operate. *See, e.g.,* Mot. at 21.

4    This is again not the proper inquiry. The Federal Circuit squarely addressed this issue

5    in *Visual Memory*, holding that "whether a patent specification teaches an ordinarily

6    skilled artisan how to implement the claimed invention presents an enablement issue

7    under 35 U.S.C. § 112, *not an eligibility issue under § 101."* 867 F.3d 1253, 1261

8    (Fed. Cir. 2017) (emphasis added). Twitter's quarrel on this score is misplaced. The

9    '362 claims solve a computer-specific problem and therefore pass muster under *Alice*

10   step one.

### 2.    PARC's Plausible Allegations, When Taken as True, Show the '362 Claims Recite an Inventive Concept.

12

13         As the '362 claims pass *Alice* step one, it is unnecessary to consider step two.

14   Even so, the claims survive this step as well. Twitter once again fails to analyze any of

15   the relevant claim elements, assuming that they involve "generic technology, none of

16   which the patentee invented." Mot. at 24. This is not the right question. "The inventive

17   concept inquiry requires more than recognizing that each claim element, by itself, was

18   known in the art." *Bascom*, 827 F.3d at 1350; *see also Cellspin*, 927 F.3d at 1318

19   (finding that "implementing a well-known technique with particular devices in a

20   specific combination…can be inventive.").

21         To survive Twitter's Motion, Plaintiff need only show "plausible and specific

22   factual allegations that aspects of the claims are inventive." *Cellspin*, 927 F.3d at

23   1317; *see also Aatrix*, 882 F.3d at 1128; *BlackBerry*, 2018 WL4846912, at *7.

24   PARC's claims, specification, Complaint, and prosecution history do just that. The

25   '362 specification notes the problem associated with conventional document editing

26   systems, and the inventive concept to overcome it (*i.e.,* the use of inline tags that

27   control the amount of the document shown to the recipient and the actions that the

28   recipient may take on the document). The Complaint reiterates these concerns. Dkt. 1

PARC RESPONSE TO TWITTER MOTION TO DISMISS          CASE NO. 2:20-CV-10754 AB(MRWx)

¶¶ 85-90. And the prosecution history states much the same. *See, e.g.,* Ex. H at 8 (stating the prior art "does not disclose a tag that indicates an action to be performed on a portion of the document, and indicates a receiving entity corresponding to the action"); Ex. I at 8 (stating that the prior art does not disclose "inserting a tag inline within the document that indicates an action to be performed, and disseminating the document portion indicated by the tag to a receiving entity corresponding to perform the action"); Ex. J at 9. Thus, the claims, specification, prosecution history, and Complaint provide ample allegations that—when taken as true—show the '362 claims contain an inventive concept. For all the reasons noted above, the '362 claims include an inventive concept and are therefore patent eligible.

### E.    Twitter's Behavior Contradicts Its § 101 Arguments.

When it suits them, Twitter defends its own patents on the very same basis it now uses to challenge PARC's. For example, Twitter patented a method of "processing [purchasing] requests in a messaging platform" in USP 10,902,497. During prosecution, Twitter argued its '497 patent "improve[ed] a user's experience of a messaging platform on a client device by providing the opportunity for a user to purchase an item sold by a vendor only if the item is likely to be in stock….This subject matter is not a mathematical concept, a *method of organizing human activity*, nor a mental process." Ex. K at 13 (emphasis added). Twitter even chastised the Examiner stating he/she "should evaluate whether the claim as a whole integrates the recited tentative abstract idea *into a practical application*…If [so]…the claim is…eligible." *Id.* It is incredible that Twitter now argues the very opposite in its Motion.

### F.    If Needed, PARC Should Be Permitted to Amend its Complaint

A district court should freely give leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). In the event that Twitter's Motion raises matters of concern for the Court, PARC requests leave to address any such issues in an amended

McKool Smith, P.C.

Complaint. *See Aatrix*, 882 F.3d at 1127 (holding that "the proposed amended complaint, which alleges facts directed to the inventive concepts in [the] claimed invention[s], would not be futile."); *Kajeet, Inc. v. Qustodio, LLC*, No. 8:18-cv-1519-JAK, 2019 WL 8060822, at *1 (C.D. Cal. Nov. 1, 2019); *Aftechmobile Inc. v. Salesforce.com, Inc.*, No. 4:19-cv-5903-JST, 2020 WL 6129139, at *12 (N.D. Cal. Sept. 2, 2020) (granting leave to amend to "plead patent eligibility").

This is especially important here, as Twitter did not provide the basis of its § 101 allegations until filing its Motion. Although Twitter attempts to shift the blame to PARC, it is Twitter that failed to raise any particulars of its Motion. This precluded PARC from understanding Twitter's arguments and being able to counter those arguments with the information noted above. And, to be clear, PARC stated that it could not amend its Complaint given Twitter's "unarticulated, baseless concerns," but noted that "PARC's statement should not be taken as foreclosing future amendments…if the circumstances merit such an amendment." Dkt. 43-4 at 4.

## IV.   CONCLUSION

At bottom, Twitter divorces the claims from the specification, and ignores or assigns no meaning to the words of the claims, all in an effort to reduce the claims to basic human practices that are "centuries old." The claims are more than that.

Had Twitter offered any insight into the basis for filing its Motion, the parties may have been able to better understand their respective positions. However, PARC doubts that would have reduced any burden on the Court as Twitter has only used this process to try and extort numerous unjustified delays, and failed to address any of the points raised in PARC's multitude of correspondences on the subject. For the reasons noted above, PARC requests that Twitter's Motion be denied in full.

PARC RESPONSE TO TWITTER MOTION TO DISMISS                    CASE NO. 2:20-CV-10754 AB(MRWx)

McKool Smith, P.C.

1 | DATED: February 26, 2021

2

Respectfully submitted,

MCKOOL SMITH, P.C.

3

BY   /s/ *David Sochia*
          David Sochia

4

5

Alan P. Block (SBN 143783)
ablock@mckoolsmith.com

6

McKool Smith Hennigan, P.C.
300 South Grand Avenue, Suite 2900

7

Los Angeles, California 90071
Telephone: (213) 694-1200
Facsimile: (213) 694-1234

8

9

David Sochia (TX SBN 00797470)
(Pro Hac Vice)
dsochia@McKoolSmith.com

10

Ashley N. Moore (TX SBN 24074748)
(Pro Hac Vice)

11

amoore@McKoolSmith.com
Alexandra F. Easley (TX SBN 24099022)

12

(Pro Hac Vice)
aeasley@McKoolSmith.com

13

McKool Smith, P.C.
300 Crescent Court, Suite 500

14

Dallas, Texas 75201
Telephone (214) 978-4000

15

Facsimile: (214) 978-4044

16

James E. Quigley (TX SBN 24075810)
(Pro Hac Vice)

17

jquigley@McKoolSmith.com
McKool Smith, P.C.

18

300 W. 6th Street, Suite 700
Austin,, Texas 7870

19

Telephone: (512) 692-8700
Facsimile: (512) 692-8744

20

ATTORNEYS FOR PLAINTIFF

21

PALO ALTO RESEARCH CENTER INC.

22

23

24

25

26

27

28

McKOOL SMITH, P.C.